

# NUMBER 13-19-00652-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

BERNARDO SAENZ GARCIA JR.,                                        **Appellant,**

**v.**

THE STATE OF TEXAS,                                        **Appellee.**

### On appeal from the 139th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Longoria, Hinojosa, and Tijerina
### Memorandum Opinion by Justice Tijerina

Pursuant to a plea agreement with the State, appellant Bernardo Saenz Garcia Jr. pleaded guilty to murder. *See* TEX. PENAL CODE ANN. § 19.02(b)(3). Garcia received a fifty-year sentence of incarceration. Garcia filed a motion for new trial, which the trial court denied. By four issues, which we construe as three, Garcia contends that the trial court erred when it accepted his plea of guilty because his plea was (1) coerced due to his

mental illness, and therefore, done involuntarily and unknowingly, (2) accepted in violation of article 26.13 of the Texas Code of Criminal Procedure, and (3) a result of ineffective assistance of counsel. We affirm.

## I.  THE PLEA HEARING

On September 19, 2019, on the cusp of going to trial, Garcia entered a guilty plea pursuant to a plea agreement with the State. The trial court asked Garcia if he had received a copy of the indictment for at least "two full days," and if he had ten days to prepare for trial. Garcia replied, "Yes" to both questions. The following colloquy occurred.

| | |
|---|---|
| The Court: | Now, you've discussed your case with your attorney; is that correct? |
| [Garcia]: | Yes, sir. |
| The Court: | And have they answered all your questions? |
| [Garcia]: | Yes, sir. |
| The Court: | Are you satisfied with the way they've represented you? |
| [Garcia]: | Yes, sir. |
| The Court: | You have a right to have the indictment read here in open court, which is the charge against you, or you can waive the reading of the indictment. What is it you want to do so, sir? |
| [Garcia]: | Waive it. |
| The Court: | Has a doctor ever told you that you are mentally incompetent? |
| [Garcia]: | No, sir. |
| The Court: | Are you presently under the influence of any drug, medication or alcohol? |

2

[Garcia]:           No, sir.

The Court:          [Trial counsel] do you find him to be mentally competent?

[Trial Counsel]:    I do, Your Honor.

The Court:          And I'll find he is mentally competent and able to assist you in whatever defense he might have. Mr. Garcia, I'm going to talk to you about some documents. The first document is the Waiver of Rights under Article 39.14. Do you see this document?

[Garcia]:           Yes, sir.

The Court:          Was this document explained to you?

[Garcia]:           Yes, sir.

The Court:          And did you understand the explanation?

[Garcia]:           Yes, sir.

The Court:          And . . . [both your trial counsel] have received documents in your case, police reports, witness statements, lab reports, every type of evidence they have, your attorneys have it. Do you understand that?

[Garcia]:           Yes, sir.

The Court:          What this document is telling me is that they don't have to possess any documents, and if they are missing any documents, you're not going to complain about that; is that correct?

[Garcia]:           Yes, sir.

The Court:          I'm going to show you a five[-]page document, sir. It says Waiver of Rights & Consent to Stipulation of Evidence and or Testimony & Plea of Guilty or No Contest. Was this document explained to you?

[Garcia]:           Yes, sir.

The Court:          Do you have any questions about it?

3

| [Garcia]: | No, sir. |
|---|---|
| The Court: | It's telling me, Mr. Garcia, that you're going to plead guilty to the charge against you. Do you understand that? |
| [Garcia]: | Yes, sir. |
| The Court: | Is it true? |
| [Garcia]: | Yes, sir. |
| The Court: | And you're going to give up all your rights; is that correct? |
| [Garcia]: | Yes, sir. |
| The Court: | Including the right to a jury trial? |
| [Garcia]: | Yes, sir. |
| The Court: | Now, before you can give up those rights, I must be satisfied that you understand what a jury trial is. Do you? |
| [Garcia]: | Yes, sir. |
| The Court: | And . . . I want to know from you if your attorneys have discussed your constitutional rights? |
| [Garcia]: | Yes, sir. |
| The Court: | And is it true that you're going to give up all your rights? |
| [Garcia]: | Yes, sir. |
| The Court: | And they've explained them to you, correct? |
| [Garcia]: | Yes, sir. |
| The Court: | Do you need for me to explain any of your rights? |
| [Garcia]: | No, sir. |
| The Court: | [T]he Code of Criminal Procedure says that [the State |

4

of Texas represented by two attorneys is] here to ensure that justice is done. [The State is] also here to introduce evidence. In a plea of guilty[,] the majority of the evidence is those documents. The documents will speak the same as if the witnesses were here. Do you understand that?

[Garcia]:          Yes, sir.

The Court:          And if you're found guilty, sir, the victims have a right to make a statement. Do you understand that?

[Garcia]:          Yes, sir.

The Court:          All right. Now, is it true that you are pleading guilty to the offense of murder?

[Garcia]:          Yes, sir.

The Court:          Murder is a first[-]degree felony carrying a range of punishment, if convicted, of no less than 5 years in the penitentiary up to 99 years or life, and a fine not to exceed $10,000. Do you understand?

[Garcia]:          Yes, sir.

The Court:          All right. In your plea of guilty do you understand that if the State proves you guilty beyond a reasonable doubt, I'm going to find you guilty. Do you understand that?

[Garcia]:          Yes, sir.

The Court:          Has anybody threatened or forced you to plead guilty?

[Garcia]:          No, sir.

The Court:          Has anybody promised you anything to get you to plead guilty?

[Garcia]:          No, sir.

The Court:          Has anybody tried to predict what sentence I will impose in order to get you to plead guilty?

5

| | |
|---|---|
| [Garcia]: | No, sir. |
| The Court: | Are you pleading guilty because the facts, as you understand them, you're guilty beyond a reasonable doubt? |
| [Garcia]: | Yes, sir. |
| The Court: | I'm going to find that you entered your plea freely and voluntarily, and I will accept the plea in this case. |

The trial court admitted, without objection and as stipulated by Garcia, the State's evidence, which included the waiver of rights, the stipulation of evidence the plea of guilty, the offense report with statements, the autopsy reports and lab reports, the agreed punishment recommendation, waiver of article 36.14 discovery, and the discovery compliance statement. The trial court asked if Garcia had any complaints against his plea counsel.[1]  Garcia responded, "No, sir."

The State explained that "with the agreement of the [deceased's] family" they would "proceed on the lesser included offense of murder" and that "[t]he recommendation and agreement is 50 years in the Texas Department of Criminal Justice with credit for the 780 days he has served." The State dismissed count two of the indictment pursuant to the plea agreement. The trial court asked Garcia and his plea counsel if that was the agreement with the State. Both said, "Yes." The trial court found Garcia guilty of "the lesser included offense of capital murder which is murder," and it sentenced him to fifty years' incarceration. Garcia agreed with the trial court that he had given up his right to appeal and his right to file a motion for new trial.

---

[1] We refer to the attorneys who represented Garcia at the plea hearing as plea counsel, and we refer to Garcia's motion for new trial hearing attorney as trial counsel.

6

Nonetheless, Garcia filed a motion for new trial. And although Garcia had waived his right to file a motion for new trial in exchange for his murder charge and against plea counsels' argument, the trial court held a motion for new trial hearing on December 2, 2019. The trial court limited the scope of the hearing to whether Garcia's plea was involuntary and whether plea counsel were ineffective.

## II.      THE MOTION FOR NEW TRIAL HEARING

At the motion for new trial hearing, Garcia presented expert testimony from Norma Villanueva, PhD, a clinical social worker with a PhD in psychology and a license for private and clinical practice. Dr. Villanueva stated that she performed an evaluation of Garcia while he was in the Hidalgo County Jail. Dr. Villanueva testified that "a brief statement" of her evaluation of Garcia is as follows:

> Garcia was raised by a 'good family.' In other words, there was no abuse. There was no neglect. He had a very good younger life where he had actually been in GT classes in school. Then there was an incident in one school [in 8th grade] that impacted him where he was put for the first time in a disciplinary proceeding and after that that's when his behavior changed.

According to Dr. Villanueva, "[t]he problems worsened to the point that he was no longer interested in school but more importantly what impacted him was substance abuse. He began a history of despair, substance abuse and later he was able to get a GED."

Dr. Villanueva stated that when Garcia was sixteen years old, he had a "critical incident" in Reynosa, Mexico, "where [he] and a friend of his w[ere] kidnapped by the Gulf Cartel." According to Dr. Villanueva, "with that incident he was actually held and there were death threats. There were bodies in the room. He was held in a place that unfortunately is typical for kidnappings that happen in Reynosa." Dr. Villanueva testified

7

that he was beaten with "some boards." Dr. Villanueva relayed that, once an adult, Garcia had an arrest for drug offenses, had a relationship with a woman who had his two children, and suffered from an "inability to gain stability emotionally."

Dr. Villanueva diagnosed Garcia with primary trauma of post-traumatic stress disorder (PTSD) and hypervigilance. Dr. Villanueva stated that once back home after the kidnapping, Garcia

> suffered with severe symptoms, hypervigilance, the paranoia, the inability to trust and also there is a history of him developing some psychosis, and with that turmoil and in mixing unfortunately also Xanax and marijuana and alcohol, that creates a cycle of despair, chemically, bio-chemically and also emotionally and because of that there were some subsequent suicide attempts.

Dr. Villanueva explained that people with PTSD have an inability to trust, an inability "to remove themselves from the fear that they chronically feel," less of an ability "to process cognitively and especially in the executive functions is decreased," and she has to "ask them to repeat the narrative back" to her "because that executive function isn't as fast or automated."[2] The trial court asked, "Are you saying, Doctor, it's a defense to murdering somebody? Are you trying to tell me that?" Dr. Villanueva said, "No, sir. . . ." The trial court stated, "Would that cause him to kill somebody what you're describing as the symptoms?" Dr. Villanueva replied, "Judge, I can't speak to that . . . part of his history."

Dr. Villanueva testified that she believed it "is highly possible that" Garcia's PTSD, "would have kicked in" during the plea agreement process. Dr. Villanueva stated that Garcia told her he had a history of psychosis, and his mother "corroborated it."

---

[2] Dr. Villanueva did not elaborate or explain further.

The following exchange occurred:

[Trial Counsel]: And based on [Garcia's] mental condition, what, if any, effect would [his PTSD] have had on his ability to understand or enter a plea on September 19, 2019 . . . on the issue of . . . whether . . . the plea was voluntary or not?

A: I think he would have acquiesced.

Q: Okay. And what do you mean by that?

A: In other words, he would have said, okay, if I do not have no other choice, then I will.

Q: Okay. Do you think it would have impacted his ability to voluntarily enter his plea the way he did back on the 19th day of September?

A: After speaking with him and hearing his understanding, yes.

. . . .

Q: He never told you anything that would indicate that there were enough facts for him to enter his plea of guilty, I guess is my question?

A: Correct.

Q: So based on that you have a recommendation or findings at the end of your report. Do you see that?

A: Yes, I do. What I did is that when he spoke to me about the situation with the plea, he did appear to, number one, be confused still about it. Definitely I stated that his past trauma, the PTSD, the drug use, the effects that are biological did also impact on his as well in the cognitive function. And also the other thing that I found in speaking with him is he was completely unaware of what triggers are. And the reason why that is so basic is because in order for people to have good cognitive

9

judgment when they have PTSD, they have to understand their triggers. So they know when to take two steps back. He had no concept whatsoever.

Q: The last thing I want to ask you is that based on the medical records that I showed you . . . he's got a history of PTSD; is that correct?

A: That is correct.

Dr. Villanueva testified that she asked Garcia whether his plea counsel had asked him about his mental health history, "[a]nd he said, they did not."

On cross-examination by the State, Dr. Villanueva clarified that she did not perform a competency exam on Garcia and that she was not testifying concerning his competency. On re-direct examination, Dr. Villanueva stated that she was only asked to testify concerning the voluntariness of Garcia's guilty plea.

During cross-examination, Dr. Villanueva acknowledged that to complete her evaluation of Garcia, she only relied on Garcia and his family members and did not rely on any other sources. Dr. Villanueva acknowledged that she did not speak with Garcia's plea counsel, and she did not review the transcript of the plea hearing. Dr. Villanueva spent "about an hour and a half" with Garcia. Dr. Villanueva was unable to verify that the alleged Reynosa incident occurred. Dr. Villanueva admitted that as a non-lawyer, she does not know the legal definition of the term competency.

Garcia's plea counsel testified that he "didn't specifically request" that Garcia be evaluated for any mental or health issues because he did not "see any need for that." Plea counsel stated that he interviewed Garcia and Garcia's mother, and he "didn't see any defensive issues in reference to his competency or his mental state at the time of the

10

offense." Plea counsel relayed that Garcia's mother "works at MHMR," and she did not "indicate" a need for an evaluation or "that his mental competency was in question."

Plea counsel acknowledged that Garcia said he suffered from PTSD, but "there was nothing apparent about his mental condition that required us to take that into consideration. A history is one thing." According to plea counsel, after he discussed the evidence with Garcia and the consequences of going to trial, "his words . . . were I don't want a trial. I want to . . . enter into a plea." Plea counsel stated:

> If I could explain, the basis for his plea was the facts of the case as reported by the police and as confirmed by . . . Garcia or as further explained by Garcia. . . . Garcia knew the facts and he chose to accept a deal and not go to a jury trial.
>
> . . . .
>
> He understood the consequences of a plea and the consequences of going forward with a jury trial in light of the evidence in this case. Requesting a mental health evaluation to determine sanity at the time of the alleged offense . . . there was nothing that indicated that he was insane at the time of the offense. Did I discuss the option of having a jury trial and the odds of winning at trial? I discussed it with him on multiple occasions. . . .

Trial counsel asked plea counsel if he thoroughly investigated the facts of the case; specifically, trial counsel wondered if plea counsel was aware of Garcia's history with the deceased. Plea counsel replied as follows:

> Well, the history between [Garcia] and the deceased was that the deceased had stolen some product from this Defendant. . . . [A]ccording to the facts in this case, [the deceased] was taken to the residence of [Garcia]. The deceased was passed out in the car. [Garcia] being angry because of the former robbery . . . I believe it was that the deceased had given him counterfeit money for drugs. . . . [Garcia] armed himself and went downstairs and confronted the deceased who, from the evidence, was passed out in the car. He was struck in the face and he revived, okay. Now, what history that is between [Garcia] and the deceased is going to be the past thievery, [Garcia's] reason for being upset with him, and going to

11

confront him.

Trial counsel asked if plea counsel had discussed the possibility of a self-defense claim based on evidence that the deceased went to Garcia's home. Plea counsel responded, "There was no self-defense claim" and stated that plea counsel had discussed that with Garcia. Garcia's trial counsel insisted that Garcia put his flak jacket on because the deceased had entered his property. Plea counsel said,

> There was no apparent self-defense claim . . . because [Garcia] armed himself, put on his flak jacket. There was no indication of prior aggression on the part of the deceased against [Garcia]. [Garcia and his codefendant] went down there. They found . . . [the deceased] asleep, passed out in the vehicle. It's hard to establish a reasonable argument for self-defense given those facts. And I don't think it's advisable, for the Defendant's benefit, for us to go in front of a jury and take an unreasonable position.

Regarding the defensive strategy to plead guilty in return for a lesser included offense to capital murder, plea counsel stated:

> They found money on the premises. They found money in his attic, there is a dying declaration. If I could explain it this way. Our theory was to bust robbery . . . [and the] capital murder . . . get rid of death and then avoid . . . life in prison without parole, avoid those things. How do we do that? By busting robbery. We actually thought we had that chance until the dying declaration was reviewed where the guy that died says they robbed me. Okay. . . . How can I put him on the witness stand where he says I didn't rob him? Because then the D.A. is going to ask that question, did you shoot this guy.

Garcia's trial counsel claimed that Garcia never said that he shot the deceased; plea counsel countered:

> Garcia told me he shot at him. In my jail conference with him, in establishing the facts . . . when your motion says that [plea counsel] didn't discuss the facts with him, he doesn't say I didn't discuss the facts with him because he told me . . . and there is something about hearing a voice. The voice that he heard was his co-defendant saying shoot him. And [Garcia] told me he shot him. Now, I cannot put [Garcia] on the witness stand to dispute robbery

12

because the State is going to ask did you shoot him. And what's the answer going to be? Yes. Otherwise, I'm supporting perjury and I won't do that.

Trial counsel asked plea counsel to go over Garcia's claims of ineffective assistance of counsel, and plea counsel answered:

On page five[:] ["]adequately discuss with . . . Garcia the option of having a jury trial and the odds of winning said trial based on the experience of the criminal defense attorneys.["] We had certain objectives, avoid the death penalty, avoid life in prison without parole. In order to avoid life in prison without parole, we had to bust one of the elements in the indictment. We actually busted it because the D.A. decided to forgo . . . the robbery claim. We were trying to get 35 years. We ended up settling at 50 years. . . . [I]t was acceptable to [Garcia] and his family. We didn't ask for the investigator. . . . I know that I thoroughly discussed with . . . Garcia the reasonableness of pleading guilty rather than a jury trial.

. . . .

I interviewed . . . Garcia to develop defenses. As a matter of fact, like within 45 days of the plea I visited with him and his parents several times. I [informed Garcia] . . . the idea of busting robbery has really disappeared because of the dying declaration. Who is the jury reasonably going to believe? I asked him, is there anything else that you can tell me that I can form a defensive issue on? He said, there was nothing else.

. . . .

I did discuss with him the law applicable to the facts. I . . . adequately investigated the applicable law based on his version of the facts. One of the things that . . . Garcia . . . tried to do was shift the blame. He blamed the young lady, Sabrina. He blamed the co-defendant. He blamed his own stepfather for his behavior. I had to constantly be getting his mind back on the fact that the indictment alleges his mental state and his behavior.

. . . .

The shift blaming wasn't going to prevail. I think there was that young lady, Sabrina, that could have been charged but she would have been charged for her own behavior . . . but her being charged was not going to help him in any capacity. He's the one that decided to get dressed, go down there, engage in a confrontation and shoot. . . . [N]ot only did I discuss it with him but out of respect to him as an individual, I spoke to his parents several

different times because this was a very serious decision. And I didn't think that he should be making this decision on his own. The mother told me that, while she was going to discuss the different things with him, she was going to leave the decision up to him. And so, you know, there is wisdom in the counsel of many.

On cross-examination, the State asked, "Was there anything in the evidence that the State gave you that would lead you to believe that a not guilty verdict was possible in this case?" Plea counsel replied,

> Well, you have to look at it from where you first started. The State wanted a guilty verdict with the death penalty. I thought that was over reaching on the part of the State. . . . [The] thing was get rid of the death penalty and get rid of life without parole and then run it down as far as we could on a 5 to 99. And, obviously, as your position changed and you became more centered to where we were at, the likelihood of getting a not guilty was going to be greater because you were becoming more in the center of our position.
>
> . . . .
>
> We met all of our defensive goals. Particularly in busting . . . the robbery element of this indictment. I don't think a jury gives him that. The key is . . . how do we present . . . no robbery issue . . . when [Garcia] cannot testify because he told me he did the shooting, okay. And I cannot put him on and ask him to lie.

Plea counsel explained the terms of the plea deal as follows: "[T]he arson . . . that was charged that he committed when he was in jail was dismissed. The robbery was dismissed. He plead[ed] guilty to murder, if I recall correctly." Plea counsel agreed with the State that there was no evidence that the deceased had a weapon or attacked Garcia, which are facts required to raise a self-defense claim. The State asked, "was there any back and forth with [Garcia] or was he just I'm taking the deal?" Plea counsel stated that "[t]here wasn't much back and forth." Plea counsel explained,

> He pretty much knew the facts and the dynamics in entering into a plea. He specifically said he did not want a trial. . . . [O]ur goal was to try to get 35. I

14

thought that was reasonable. If we take an unreasonable position, your office is just going to say no. So we don't take that unreasonable position. He said he didn't want a trial. So on the day of the plea we took some time with him. The Judge allowed us to use the jury room to discuss this with the parents and the result was that he agreed to accept it and that he would plead guilty to 50 years.

Plea counsel found nothing "at all" to indicate that Garcia was incompetent or insane. Regarding whether Garcia was rushed into pleading guilty, plea counsel stated that the trial court "was very gracious in giving" him "all the time necessary and giving us the facilities to consult with the family that were necessary so that this decision would be entered with all deliberation." Thus, according to plea counsel, there was no rushing. Plea counsel testified that "[t]here was nothing that [he] saw that would indicate" that Garcia's plea of guilty was not made voluntarily, knowingly, and intelligently.

Two attorneys represented Garcia at the plea hearing. The second plea counsel testified that he "felt" that Garcia was competent when he talked to him. According to this plea counsel, Garcia told him "'I don't want a trial.'" This plea counsel stated that Garcia lied on his affidavit in support of his motion for new trial. Plea counsel said, "It's incorrect everything he said." Plea counsel did not believe that Garcia was incompetent or insane, and Garcia did not have trouble communicating with him about the case. Plea counsel testified that after reviewing the consequences and benefits of going to trial with Garcia, Garcia said that he did not want to go to trial. Plea counsel stated, "He made it clear to me he doesn't want a trial."

The trial court denied Garcia's motion for new trial. The trial court gave Garcia permission to appeal the denial of his motion for new trial, and this appeal followed.

15

### III.    STANDARD OF REVIEW

We review a trial court's ruling on a motion for new trial for an abuse of discretion. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). We view the evidence in the light most favorable to the trial court's ruling and if it was within the zone of reasonable disagreement, we uphold the ruling. *Id.* (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). "We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable." *Id.* "[A] trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling." *Id.* (citing *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004).

### IV.    VOLUNTARINESS

A trial court should not accept a plea of guilty unless the defendant is competent, and the plea is free and voluntary. *See* TEX. CODE CRIM. PROC. ANN. art. 26.13. "[A] plea is involuntary when it is 'induced by threats, misrepresentations, or improper promises'" by the prosecutor, judge, or law enforcement officials. *Rios v. State*, 377 S.W.3d 131, 136 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (quoting *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006)).

An "attestation of voluntariness at the original plea hearing imposes a heavy burden on the defendant at a later hearing to show a lack of voluntariness." *Dusenberry v. State*, 915 S.W.2d 947, 949 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd). In addition, regularity of the judgments and proceedings are presumed, and the appellant has the burden of overcoming this presumption. *Id.*

16

## V.     MENTAL ILLNESS

By his first issue, Garcia contends that the trial court should have granted his motion for new trial because due to his mental illness, his guilty plea was involuntary, unknowing, and coerced.

At the motion for new trial hearing, Garcia presented evidence that he has PTSD. Although Garcia did not testify at the motion for new trial hearing, the trial court admitted his affidavit attached to his motion for new trial stating that he was diagnosed with the mental illness schizophrenia while in jail. At the plea hearing, Garcia told the trial court that a doctor had never told him that he was mentally incompetent; while, in his affidavit, Garcia claimed that he had been diagnosed with mental disorders that affected his competence. However, the trial court was free to disbelieve Garcia's affidavit, especially given that it had presided at the plea hearing and both plea counsel testified that Garcia was able to understand the consequences of pleading guilty. *See Russell v. State*, 711 S.W.2d 114, 116 (Tex. App.—Houston [14th Dist.] 1986, pet. ref'd). Furthermore, Garcia stated that he takes medication to manage his symptoms which include hearing voices "and seeing things that are not really there." However, Garcia does not allege in his affidavit that his alleged mental illness caused him not to understand the plea agreement, and no such evidence was presented. In addition, he did not allege in his affidavit that he did not understand the consequences of pleading guilty. Moreover, Garcia presented no evidence that PTSD or any mental issues could have caused his plea to be involuntary, unknowing, or coerced. Therefore, the trial court did not abuse its discretion by denying his motion for a new trial on that basis. *Webb*, 232 S.W.3d at 112. We overrule Garcia's

17

first issue.

## VI.    ARTICLE 26.13

By his second issue, Garcia contends that the trial court should have granted his motion for new trial because by accepting his guilty plea, the trial court violated article 26.13 of the code of criminal procedure. Article 26.13 provides that a trial court must not accept a plea of guilty unless it appears that the defendant is mentally competent and that the defendant's plea is voluntary. TEX. CODE CRIM. PROC. ANN. art. 26.13.

Garcia did not seek a new trial pursuant to article 26.13, and he did not present any evidence at the motion for new trial hearing that the trial court violated article 26.13. Therefore, the trial court was not asked to make a ruling on this basis. *See* TEX. R. APP. P. 33.1 (providing that the to preserve error the complaining party must make a specific objection or complaint to the trial court and obtain a ruing thereon). Accordingly, we overrule Garcia's second issue.

## VII.    INEFFECTIVE ASSISTANCE OF COUNSEL

By his third issue, Garcia contends that his plea counsel were ineffective causing his guilty plea to be involuntary, unknowing, and coerced.

## A.    Applicable Law

Claims of ineffective assistance of counsel are evaluated under the two-part test articulated by the Supreme Court in *Strickland v. Washington. See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). The *Strickland* test requires the appellant to show that counsel's performance was deficient,

18

or in other words, that counsel's assistance fell below an objective standard of reasonableness. *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 687. Assuming appellant has demonstrated deficient assistance, he must then show that there is a reasonable probability that, but for counsel's errors, the result would have been different. *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 694. In determining the validity of an appellant's claim of ineffective assistance of counsel, "any judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight." *Thompson*, 9 S.W.3d at 813.

The burden is on the appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Id.* An appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689; *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). A reviewing court will not second-guess legitimate tactical decisions made by trial counsel. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) ("[U]nless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate . . . ."). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813; *Jaynes*, 216 S.W.3d at 851. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002); *Thompson*,

9 S.W.3d at 814 (setting out that "in the vast majority of cases, the undeveloped record on direct appeal will be insufficient for an appellant to satisfy the dual prongs of *Strickland*"); *see Jackson v. State*, 877 S.W.2d 768, 771–72 (Tex. Crim. App. 1994) (en banc) (holding that "we must presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that he made all significant decisions in the exercise of reasonable professional judgment" and that "[d]ue to the lack of evidence in the record concerning trial counsel's reasons" for the alleged ineffectiveness, the court was "unable to conclude that the appellant's trial counsel's performance was deficient") (internal quotations omitted).

## B. Discussion

Garcia claims that his plea counsel "were not reasonably competent" because "[t]he legal advice and misinformation given to [him]" fell outside the range of competency demanded of attorneys. The bulk of Garcia's appellate complaints relate to his plea counsels' strategic choices.

For example, Garcia faults plea counsel for not seeking a mental health evaluation. However, plea counsel testified that he did not see any reason to do so. Next, Garcia complains that although aware of the PTSD, plea counsel were not aware that Garcia suffered from psychological issues in the past. However, plea counsel stated they were aware of his mental issues, but Garcia showed no signs of being incompetent or of being legally insane and he understood the plea proceedings. In addition, at the motion for new trial hearing, Garcia's trial counsel continuously acknowledged that Garcia was not claiming to be incompetent.

Garcia also claims that he was coerced into pleading guilty by the ineffective assistance of his plea counsel because they did not show him the videos or photographs related to the crime. The evidence at the motion for new trial hearing established that Garcia pleaded guilty because he wanted to avoid the death penalty, avoid life in prison without parole, and he was guilty as he admitted to his plea counsel that he shot the deceased. Moreover, Garcia did not present any evidence that there was anything in the videos or photographs that would have caused him to go to trial for capital murder.

Garcia claims that plea counsel did not investigate the deceased's past criminal history or his reputation. However, Garcia did not present any evidence supporting his implication on appeal that it was the deceased who showed aggression before being shot. In addition, plea counsel testified extensively about the facts of the case and stated that the evidence showed that the deceased was asleep when he was attacked by Garcia and his co-defendant.

Next, Garcia argues as follows:

Neither [plea] counsel attempted to investigate the prior relationship between [the deceased] and [Garcia] for purposes of Art. 38.36, T.C.Cr.P., and to determine . . . Garcia's state of mind when the purported crime occurred. [Plea counsel] never even asked the questions such as what . . . Garcia knew about the deceased person, whether he was violent, whether he had committed home invasions in the past, etc. [Plea counsel] never asked . . . Garcia why he was wearing a flak jacket. [Plea counsel] did not even know whether proceeds on the person of [the deceased] were proceeds of drug [sales] to others. Further, [the deceased's] dying declaration did not tie the crime to . . . Garcia. [Plea counsel] never inquired with . . . Garcia as to his version of the facts in the case and [Garcia] never told [plea counsel] that he did shoot the purported victim. . . . Garcia told [plea counsel] that he shot into the air, not upon the [deceased]. [T]he co-defendant had admitted that he had fired a weapon that evening. The gun that [the co-defendant] utilized was fired and the casing was still in the weapon. . . . Garcia never admitted to [plea counsel] that he shot [the

21

deceased]. [Plea counsel] never showed . . . Garcia [the] co-defendant['s] witness statement or video of his interrogation by the police. [Plea counsel] guaranteed to . . . Garcia that he would be out of prison in 25 years; however, whether a defendant is released on parole wholly depends on Board of Pardons and Parole.

Many of Garcia's above-made complaints are belied by the record and evidence. Moreover, Garcia has not explained how knowing the answers to any of the questions posed above would have changed the outcome of the case. In addition, Garcia does not explain how his complaints cannot be considered sound trial strategy despite his plea counsel testifying that all their acts were the result of sound trial strategy. Therefore, indulging in a strong presumption that plea counsels' conduct was reasonable as we must, *see Strickland*, 466 U.S. at 689, we conclude that Garcia has not met his burden of showing that these complaints make his plea of guilty involuntary. *See Ex parte Adams*, 707 S.W.2d 646, 648 (Tex. Crim. App. 1986). The trial court did not abuse its discretion in denying Garcia's motion for new trial on the basis that his plea counsel rendered ineffective assistance. We overrule Garcia's third issue.

## VIII.   CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
5th day of August, 2021.

22